UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES M., <br><br> Plaintiff, <br><br> v. <br><br> KILOLO KIJAKAZI, <br> ACTING COMMISSIONER OF <br> SOCIAL SECURITY,[1] <br><br> Defendant. | No. 20 CV 2082 <br><br> Magistrate Judge McShain |

**MEMORANDUM OPINION AND ORDER**

Plaintiff James M. brings this action for judicial review of the Social Security Administration's (SSA) decision denying his application for benefits. For the following reasons, plaintiff's request to reverse and remand the SSA's decision [20][2] is granted, the Acting Commissioner of Social Security's request to affirm the SSA's decision [25] is denied, and this case is remanded to the agency for further administrative proceedings.

**Procedural Background**

On March 29, 2015, plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging an onset date of May 28, 2010. [15-1] 15. The claim was denied initially and on reconsideration. [*Id.*]. Plaintiff requested a hearing, which was held by an administrative law judge (ALJ) in April 2017. [*Id.*]. In a decision dated August 28, 2017, the ALJ found that plaintiff was not disabled and denied his application. [*Id.*] 15-29. After the Appeals Council denied review, plaintiff appealed to the United States District Court for the Northern District of Illinois, where the parties jointly agreed to remand the case. [15-8] 760. Thereafter, the Appeals Council remanded the case for a new hearing before the ALJ. [*Id.*] 765-71.

---

[1] In accordance with Fed. R. Civ. P. 25(d), Kilolo Kijakazi, the Acting Commissioner of Social Security, is substituted as the defendant in this case in place of the former Commissioner of Social Security, Andrew Saul.

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except for citations to the administrative record [15], which refer to the page numbers in the bottom right corner of each page.

After holding another hearing in October 2019, the ALJ issued a decision dated December 3, 2019 in which she again found that plaintiff was not disabled and denied his application for benefits. [15-7] 607-626. Plaintiff timely appealed to this Court [1], and the Court has subject-matter jurisdiction to review the Acting Commissioner's decision under 42 U.S.C. § 405(g).[3]

## Legal Standard

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled, the ALJ conducts a sequential five-step inquiry: (1) whether the claimant is unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any listed impairments; (4) whether the claimant is unable to perform her past relevant work; and (5) whether the claimant is unable to perform any other available work in light of her age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

The Court reviews the ALJ's decision deferentially to determine if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019)). But the standard "is not entirely uncritical. Where the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Brett D. v. Saul*, No. 19 C 8352, 2021 WL 2660753, at *1 (N.D. Ill. Jun. 29, 2021) (internal quotation marks and citation omitted).

## Discussion

At step one of her decision, the ALJ found that plaintiff had not engaged in substantial gainful employment since his alleged onset date. [15-7] 609. At step two, the ALJ determined that plaintiff suffered from multiple severe impairments: cervical spondylosis, obesity, degenerative disc disease and osteopenia of the left

---

[3] The parties have consented to the exercise of jurisdiction in this case by a United States Magistrate Judge. [10].

shoulder, left carpal tunnel syndrome with left wrist neuropathy, migraine headaches, sleep apnea, and gout. [*Id.*] 609-10. At step three, the ALJ ruled that plaintiff does not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments. [*Id.*] 610. Before turning to step four, the ALJ found that, through the date last insured, plaintiff had the residual functional capacity (RFC) to perform sedentary work, except that plaintiff (1) could occasionally climb ramps and stairs but can never climb ladders, ropes, or scaffolds; (2) could occasionally balance, stoop, kneel, crouch, but not crawl; (3) could occasionally reach overhead; (4) could frequently handle and finger with the left (dominant) hand; (5) could not have concentrated exposure to extremes of cold, heat, humidity, or vibrations; (6) could not work around unprotected heights, open flames, or unprotected dangerous machinery; and (7) could not work in an environment with moderate noise levels. [*Id.*] 612. At step four, the ALJ found that plaintiff could not perform his past relevant work as a Garbage Collector Driver. [*Id.*] 623. At step five, the ALJ ruled that considering plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that plaintiff could perform, including Information Clerk (70,000 jobs nationally), Order Clerk (54,000 jobs nationally), and Charge Account Clerk (32,000 jobs nationally). [*Id.*] 624-25.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because (1) the vocational expert's (VE) job-number testimony was not the product of a reliable methodology, (2) the ALJ erred in evaluating plaintiff's subjective symptom allegations, and (3) the ALJ misapplied the treating-physician rule when she addressed the opinions of Dr. Variakojis (a pain specialist) and Dr. Alawad (plaintiff's primary doctor). For the reasons set forth below, the Court agrees that the ALJ erred in relying on the VE's testimony because the VE did not establish that she used a reliable methodology to estimate the number of jobs that plaintiff could perform. To the contrary, although the VE testified that she relied on her experience to arrive at her job-number figure, the VE's testimony did not demonstrate that she brought "any aspect of [that] experience to bear on the reliability of those numbers. [She] did not say *why* [she] thought [her] numbers were reliable." *Rennaker v. Saul*, 820 F. App'x 474, 479 (7th Cir. 2020) (emphasis in original). Accordingly, the Court will remand this case for further administrative proceedings.[4]

### A. No Substantial Evidence Supports the ALJ's Step-Five Finding.

At step five of the sequential evaluation process, "the agency bears the burden of demonstrating that there are significant numbers of jobs in the national economy for someone with the claimant's abilities and limitations." *Ruenger v. Kijakazi*, 23 F.4th 760, 761 (7th Cir. 2022).

---

[4] Because this issue is dispositive, the Court does not reach plaintiff's other arguments for reversal.

To resolve that issue, "ALJs commonly rely on the testimony of vocational experts–professionals with experience in job placement and knowledge of working conditions." *Ruenger*, 23 F.4th at 761. "To provide tailored job-number estimates, vocational experts use various sources," including "the Dictionary of Occupational Titles (DOT), a publication produced by the Department of Labor that lists job titles and their requirements." *Id.* Important for present purposes, "the DOC does not estimate how many positions exist in the national economy for each job title." *Id.* at 762. For that reason:

> vocational experts commonly use another source produced by the Department of Labor that does provide job-number estimates: the Occupational Employment Survey. Unfortunately for vocational experts, this publication organizes its estimates not by DOT job titles but by another classification system, the "standard occupational classification" (SOC) system. SOC codes sort jobs into broad occupational categories, such as "mathematicians" (SOC 15-2021) or "electrical engineers" (SOC 17-2071), that each encompass multiple DOT job titles. This creates a matching problem: vocational experts can identify the number of jobs in the larger SOC grouping but cannot identify how those jobs are distributed among individual DOT job titles within that grouping.

*Id.* (internal citation omitted).

"In the context of job-number estimates, [the Seventh Circuit has] observed that the substantial evidence standard requires the ALJ to ensure that the approximation is the product of a reliable method." *Chavez v. Berryhill*, 895 F.3d 962, 968 (7th Cir. 2018). "Establishing the reliability of a job-number estimate does not require meeting an overly exacting standard." *Id.* "A methodology is reliable when it is based on well-accepted sources and the vocational expert explains her methodology cogently and thoroughly." *Ruenger*, 23 F.4th at 763 (internal quotation marks omitted). "And when, as here, the claimant challenges the job-number estimate, the ALJ must compel the vocational expert to offer a reasoned and principled explanation of the methodology she used to produce the estimate." *Id.* (internal quotation marks omitted). "Testimony that incants unelaborated words and phrases such as 'weighting and allocation' and 'my information that I have' cannot satisfy the substantial-evidence standard." *Brace v. Saul*, 970 F.3d 818, 822 (7th Cir. 2020). Instead, "[t]he expert's explanation must be sufficient to instill some confidence that the estimate was not conjured out of whole cloth." *Ruenger*, 23 F.4th at 763 (internal quotation marks omitted).

"A finding based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated." *Chavez*, 895 F.3d at 968 (internal quotation marks and brackets omitted).

4

1. **The VE's Testimony**

After the VE identified the three jobs that plaintiff could perform, plaintiff's counsel asked the VE to identify "the source of the job numbers for the three jobs that you've provided." [15-8] 713. The VE testified as follows:

A: Well I got that directly from the U.S. Department of Labor, Bureau of Labor Statistics.

Q: Okay. And then it's my understanding that the Bureau of Labor Statistics gives an – doesn't differentiate between skill and exertional level, it just gives broad categories of numbers. Is that correct?

A: Right.

Q: Okay. So how do you get from the clerk position to the order clerk number DOT that you provided

A: Ultimately, it's my best estimate. But I go through a process of I know the jobs that I use are typically the jobs that a lot of people understand and are familiar with. So I look at those first, and I have learned these – the SOC numbers, which are the Standard Occupational Classifications for those jobs. And that can narrow down the Bureau of Labor Statistics work quite a lot. And so you can go into that, into the SOC, and it gives you the industry classification. And then you can go – more specifically, when you get the SOC numbers, you can go into the specific classifications where the jobs that I am looking at are found.

Q: Well – and –

A: And from then, it's my best estimate on what is reasonable.

Q: So the SOC numbers, do they still contain multiple different *Dictionary of Occupational Titles* and different skill and exertional levels?

A: They have many different titles in them, yes.

Q: So –

A: But they're all in the general classification of an industry.

5

Q: Right. So how – because there could be clerks that are medium or heavy in that classification of SOC codes. So then how do you then get from there to the specific job numbers?

A: Well, for these, it was my best estimate. These are sedentary unskilled jobs. That's the lowest level in the U.S. economy, so I take a very small percentage, probably something under five percent. And that's as specific as I can give you.

Q: So how do – based on the testimony that you're given, how do we know that the method that you're following is a reliable amount of job numbers that equate to the sedentary clerk position role that you're providing?

A: I have knowledge of the general – on that market.

Q: But I understand having knowledge, and I understand best estimate. But I'm looking for the methodology.

A: That's it. I don't have a methodology. I don't have algorithms or any of that. I've quote [*sic*] the labor market, I go to the statistics there, and from then on, it's my understanding of the labor market that rules my judgment on the numbers.

Q: So where I'm losing you, and I'll try one more time, is so, the SOC group that had multiple different *Dictionary of Occupational Titles*, we've agreed that it could contain them at different skills and exertions, so –

A: I've answered that as best I can.

Q: Only experience?

A: Experience and my best estimate of the number.

Q: But how does your experience in job placement in the local market allow you to provide reliable information about the job numbers in the national economy, extrapolating from the massive SOC code potentially numbers, to the job you're providing from the *Dictionary of Occupational Titles*?

A: These are not esoteric jobs. They're standard jobs. They're well-known throughout the country. A janitor is pretty much a janitor, for example. And I'm basing it on – the Chicago market is very

6

> robust and volatile, and I think they might be typical of the national economy. But in any event – and still, it's my estimate on what I think the numbers would be logically arrived at.

[15-8] 713-16.

Following this exchange, plaintiff's counsel objected that the VE had not described a reliable methodology for estimating jobs numbers. [15-8] 716-17. The ALJ overruled the objection but allowed plaintiff to file a post-hearing brief further addressing the VE's methodology. [*Id.*] 717-18. In her written decision denying plaintiff's claim, the ALJ reiterated her conclusion that the VE's methodology was reliable:

> The [VE] has professional knowledge and experience in job placement. She explained that her numbers are based on statistics that come from the United States Department of Labor's Bureau of Labor Statistics. When questioned by the claimant's representative, the [VE] testified that she is well-aware of the fact that the Standard Occupational Classifications (SOC) used in those numbers contain multiple DOT numbers. She further explained that, as part of her process, she starts with those numbers, and then, based on her knowledge and experience, reduces those numbers to provide her best estimate as to the number of jobs in the national economy that match a specific DOT code. She further explained that, by way of example, given the relevant facts of this case, in which she is looking for sedentary, unskilled jobs, she would take a very small (less than 5) percentage of the numbers provided in the SOC. I find that this is a reasonable methodology . . . Furthermore, even if I were to take only a small portion of these jobs, reducing it to only 10% or even only 5% of the numbers provided by the vocational expert, this would still leave thousands of jobs available in the three positions offered by the vocational expert as examples.

[15-7] 624-25.

### 2. The VE's Job-Number Estimate Was Not Based on a Reliable Methodology.

Plaintiff argues that the VE's job-number figure was not the product of a reliable methodology. According to plaintiff, the VE claimed to rely on her experience to arrive at a "best estimate" of the number of jobs, but the VE failed to explain how her experience helped her to determine the number of jobs plaintiff could perform or identify any of the factors that led to her "best estimate." Plaintiff likens this case to *Brace v. Saul*, where the Seventh Circuit held that a VE's testimony that he arrived at a job-number figure by using "my information that I have as far as how the

7

frequency of those jobs are performed" and "an allocation based upon weighting or re-weighting those allocations" was not substantial evidence that could support the ALJ's step-five ruling. 970 F.3d at 822.

The Acting Commissioner responds largely by restating the ALJ's decision overruling plaintiff's objection to the VE's testimony. [25] 13. Thus the Acting Commissioner notes that the ALJ found that the VE "started with [the] numbers" in the Standard Occupation Classifications and then, "based on her knowledge and experienced, reduced those numbers to provide her best estimate as to the number of jobs in the national economy that match a specific DOT code." [*Id.*]. The Acting Commissioner also observes that the VE in this case was "looking for sedentary, unskilled jobs," so the VE "would take a very small (less than five) percent of the numbers provided in the SOC." [*Id.*] 13-14. Finally, the Acting Commissioner argues that *Brace v. Saul* is not persuasive here because that case "did not create a blanket rule that a VE's estimates could never be reliable." [*Id.*] 14.[5]

The Court finds no basis in the VE's testimony to conclude that her job-number estimate was the product of a reliable methodology. Cases like *Ruenger*, 23 F.4th at 761-62, and *Chavez*, 895 F.3d at 964-65, establish that a "matching problem" arises when a VE estimates job numbers based on the *Dictionary of Occupational Titles*, which identifies existing jobs and their requirements (but not the number of such jobs), and the SOC codes, which identify the number of existing jobs (but only in very broad categories that are not linked to specific *DOT* job titles). The VE in this case acknowledged that this problem existed, *see* [15-8] 713-14, but she did not describe the factors or considerations she relied on to resolve the matching problem. Instead, she repeatedly invoked her "experience" and insisted she could provide only a "best estimate" of the number of jobs that plaintiff could perform. *See* [*id.*] 714-16. While it is undisputed that "a VE may draw from his expertise" and experience when providing job-number testimony, the VE must establish that he brought some "aspect of his experience to bear on the reliability of those numbers." *Rennaker*, 820 F. App'x at 479. In other words, the VE must "say *why* he thought his numbers were reliable." *Id.* (emphasis in original); *see, e.g.*, *Dugan v. Comm'r of Soc. Sec.*, Cause No. 1:20-cv-344-SLC, 2021 WL 5231731, at *6 (N.D. Ind. Nov. 9, 2021) (VE's testimony that "he arrived at national numbers based on projections from a regional sampling of jobs from the Chicago area–that is, the VE conducts his own market surveys–used in conjunction with population surveys and Bureau of Labor Statistics SOC codes" demonstrated that his methodology was reliable).

Here, however, the VE "did not explicitly tie [her] background to [her] estimate of nationwide job numbers," *Rennaker*, 820 F. App'x at 479, nor did she give a reasoned explanation of how she moved from the broader SOC codes and job numbers to the more specific *DOT* titles (and associated job numbers) that plaintiff could perform. Instead, the VE testified, she (1) went "through a process" of first "look[ing]"

---

[5] Nowhere in his briefs does plaintiff argue that *Brace* created such a blanket rule.

at "the jobs that a lot of people are familiar with"; (2) used the corresponding SOC codes to determine "the industry classifications" where "the jobs that I am looking at are found"; and (3) "from then, it's my best estimate on what's reasonable." [15-8] 714. Pressed by plaintiff's counsel on the fact that there were jobs with different skill and exertional levels within these SOC classifications, the VE responded only that, "for these, it was my best estimate" and that she had "take[n] a very small percentage, probably something under five percent. And that's as specific as I can give you." [*Id.*] 715. This "incant[ation]" of "unelaborated words and phrases," *Brace*, 970 F.3d at 822, was no more illuminating than the VE's earlier testimony invoking her "experience," nor does it appear to resolve the matching problem that arose in this case. As best the Court can tell, the VE apparently arrived at her "best estimate" simply by reducing the number of sedentary, unskilled jobs associated with the SOC codes by 95% or more. *See* [*id.*] 715. But the VE never explained why reducing the job numbers in this fashion made her job-estimate reliable. Perhaps the VE believed that by reducing the job numbers associated with the SOC codes by 95% or more would ensure that she did not overestimate the number of jobs that plaintiff could perform. But even if that were the case, this reduction did not eliminate the possibility– previously acknowledged by the VE–that the remaining jobs included some that were not an appropriate fit for a claimant with plaintiff's RFC. Nor, finally, did the VE address in any way how her experience helped her apportion even the reduced SOC job numbers among the different *DOT* titles within the particular SOC codes the VE was relying on. The VE's testimony was "far from cogent and thorough and fails to connect the dots such that the Court can ascertain that the VE's job numbers are reliable." *Julie Z. v. Kijakazi*, Civil No. 1:21cv19, 2022 WL 443721, at *6 (N.D. Ind. Feb. 14, 2022) (internal quotation marks omitted).

In that respect, this case is on all fours with *Teteak v. Kijakazi*, 20-cv-878-wmc, 2021 WL 3828831 (W.D. Wis. Aug. 27, 2021). Asked at the administrative hearing in that case "how he derived the numbers" of jobs that plaintiff could perform, "the VE simply testified that he relied on his experience" and "attempt[ed] to provide assurance that he had reduced the numbers to such an extent as to ensure their reliability":

> Given – well given my – given numbers that the Department of Labor doe[s] – they put out either state or either nationally, and knowing that those numbers exist and they're widely accepted by governments and businesses and companies and so forth, so by reducing that, I'm quite comfortable that the numbers are not overstated either by the government or by, you know, my estimates when I do this.

*Id.*, at *5.

Based on this testimony, the district court had "little confidence that the VE was capable of meaningfully translating national SOC numbers into DOT jobs, much

9

less estimat[ing] actual availability of those jobs." *Teteak*, 2021 WL 3828831, at *5. Because the VE "fail[ed] to explain how his experience would assist him in dividing up SOC job numbers among numerous DOT numbers falling within a particular SOC," *id.*, the district court held that the VE's testimony did not amount to substantial evidence that could support the ALJ's ruling at step five. *See also Julie Z.*, 2022 WL 443721, at *5 (remanding where "it is still entirely unclear" from VE's testimony "how the VE arrived at his percentages/ratios to reduce the broad (and apparently incorrect) job numbers to include only those that Plaintiff could perform").

Finally, the Seventh Circuit's recent decision in *Fetting v. Kijakazi*, 62 F.4th 332 (7th Cir. 2023), does not require a different result. In that case, the Seventh Circuit held that the VE's job-number testimony, which was based on "the OES numbers and his thirty years of job placement experience," was based on a reliable methodology and constituted substantial evidence for purposes of the ALJ's step-five ruling. *Id.* at 339. Critically, though, and unlike the VE in this case, the VE in *Fetting* "gave enough detail for [the court] to understand the sources of his data and the general process he adopted." *Id.* Earlier in its decision, the Seventh Circuit recounted that testimony:

> The VE stated that he calculated his estimates from numbers published by the U.S. Bureau of Labor Statistics. He explained that "[t]he Bureau [does] not provide job numbers on individual ... occupations" and instead "combine[s] several occupations in a grouping." To estimate the prevalence of an individual occupation within a grouping, the VE explained, he "look[ed] at the composition of [the] group" and determined the relative frequency of each occupation within the group using his "knowledge of the labor market, [acquired] over 30+ years of job placement activities." Fetting's attorney asked the VE if he used a specific formula, to which the VE stated: "It's a simple formula based on the composition of that grouping. It's not a hard and fast scientific type formula." At the end of the hearing, Fetting's attorney asked the VE if he had "done any analysis to validate" his estimates. The VE stated that he had not conducted any "formal analysis" but had "in the past checked numbers in other reporting formats."

*Id.* at 335-36 (brackets in original);

This passage from *Fetting* provides an example of how a VE might bring his or her experience to bear when estimating the number of jobs that a claimant can perform. In this case, however, there is no indication that the VE drew on her experience to "estimate the prevalence of an individual occupation within a grouping," to "determine[ ] the relative frequency of each occupation with a grouping," or to otherwise demonstrate that her methodology was reliable. For that reason,

10

*Fetting* is distinguishable, and a remand for further administrative proceedings is warranted in this case.[6]

### B. Remand Is the Appropriate Remedy.

Plaintiff argues that the Court should reverse and remand the case to the agency for an award of benefits, *see* [20] 4, which the Acting Commissioner opposes, contending that a remand is the appropriate remedy. On this point, the Court agrees with the Acting Commissioner. "[A]n award of benefits is appropriate only if all factual issues have been resolved and the record supports a finding of disability." *Estes v. Kijakazi*, No. 21 C 5870, 2023 WL 2333298, at *3 (N.D. Ill. Mar. 2, 2023). But "[w]hen the ALJ's decision is unsupported at Step 5"–as it is in this case–"the proper remedy is a new Step 5 hearing where the vocational expert may be able to expand on her testimony o[r] make some other showing that significant jobs exist for [plaintiff], and where plaintiff "will have the opportunity to challenge such a showing." *Matthews v. Kijakazi*, Cause No. 2:21-CV-193 RLM-JPK, 2022 WL 3025887, at *9 (N.D. Ind. Aug. 1, 2022); *see also Ruenger*, 23 F.4th at 764 (remanding for new step-five hearing after concluding that VE's job-number estimate was unreliable).

### Conclusion

For the reasons set forth above, plaintiff's request to remand the SSA's decision [20] is granted and the Acting Commissioner of Social Security's request to affirm the SSA's decision [25] is denied. In accordance with the fourth sentence of 42 U.S.C. § 405(g), this case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: May 25, 2023**

---

[6] Because the Acting Commissioner has not argued that the ALJ's error at step five was harmless, the Court finds that any such argument has been forfeited. *See Joshua J.H. v. Kijakazi*, Case No. 21 C 837, 2022 WL 2905673, at *4 (N.D. Ill. Jul. 22, 2022).